UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Streicher's, Inc.,                                                      Civ. No. 23-995 (PAM/ECW)

                              Petitioner,

v.                                                            **MEMORANDUM AND ORDER**

Hans C. Hummel, Director of
Industry Operations for the
ATF's St. Paul Field Division,

                              Respondent.
_____

    This matter is before the Court on Petitioner Streicher's, Inc.'s Motion for a
Temporary Restraining Order and Preliminary Injunction.  After receiving briefing from
both parties, the Court held a hearing on the Motion on April 19, 2023.  As stated at the
hearing, and for the following reasons, the Court grants the Motion for Preliminary
Injunction and enjoins Respondent Hans C. Hummel ("ATF") from revoking Streicher's
federal firearms licenses pending a proceeding on the merits of Streicher's claims.

**BACKGROUND**

    Streicher's is a law-enforcement supply store and a federal firearms dealer in
Plymouth, Minnesota.  (Pet. (Docket No. 1) ¶ 2.)  Streicher's holds two different federal
firearms licenses:  a type 01, which is a license to sell firearms, including semi-automatic
and fully automatic rifles; and type 09, which licenses the store to sell destructive devices.
Streicher's is the only type 09 dealer in the state of Minnesota.  Streicher's has had a type
01 license since 1983 and received the type 09 license in 2018.  According to Streicher's,
more than 90% of its firearms sales are to law-enforcement agencies and officers—it is the

exclusive supplier of rifles to the Minnesota State Patrol's SWAT team and supplies more than 85% of the Minneapolis Police Department's firearms, for example.  Moreover, as the only type 09 licensed dealer in the state, law-enforcement agencies rely on Streicher's for things like stun grenades, flash-bang grenades, and rubber and bean bag rounds used in grenade launchers, primarily for crowd and riot control.

In the fall of 2021, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") opened an investigation into Streicher's sale of two pistols to the Chief of the Big Lake Police Department, Matthew J. Hayen.  The former Big Lake Police Chief, Joel Scharf, asserted that Chief Hayen was not the actual purchaser of one of the two pistols—in other words, former Chief Scharf alleged that Chief Hayen was a straw purchaser of one of the pistols, which was actually purchased by former Chief Scharf.

The purchase itself happened in July 2021, when Chief Hayen, accompanied by former Chief Scharf, brought two pistols owned by the Big Lake Police Department to Streicher's, along with a letter from the Big Lake Police Department and co-signed by the City Administrator, authorizing the transfer of the pistols to Chief Hayen.  Streicher's transferred ownership of the pistols to Chief Hayen and entered the information regarding the transfer into the records it is required to keep as a federally licensed firearms dealer. At the time of the transfer, Chief Hayen signed a form attesting that he was the actual transferee of the firearms at issue.  Pet. ¶ 17.  Chief Hayen has subsequently admitted that the transferee of one of the pistols was in fact former Chief Scharf.

The details of this transaction are important to an understanding of the ATF's investigation and revocation determination here.  When Hayen and Scharf first entered

2

Streicher's, Scharf attempted to purchase the second pistol.  Scharf no longer resides in Minnesota, however, and when he showed an Arizona driver's license to the clerk, the clerk indicated that an out-of-state driver's license was not an acceptable identification for a gun purchase.  After that discussion, Hayen altered the letter authorizing the transfer of the pistols to provide for the transfer of two pistols rather than one (ATF Hr'g Ex. 15 (Docket No. 21-1 at 55)), and the clerk allowed that transfer.  But Scharf paid for the pistol with his own credit card and left the store with the pistol.  (See id. Exs. 19, 20 (Docket No. 21-1 at 59-60) (showing two different credit cards for the two pistol purchases); see also Ex. 22 (summary of Hayen interview admitting that Hayen and Scharf "each paid for their firearms with their own credit cards").)[1]

Streicher's also did not contact the National Instant Check System ("NICS") for an instant criminal background check on either Hayen or Scharf.  Streicher's contends that such a background check is not required when the purchaser/transferee has a letter from a police department authorizing the transfer of the firearms for use in "performing official duties," 27 C.F.R. § 478.134, which Chief Hayen had.

Sometime after the pistols' transfer, according to Streicher's, former Chief Scharf and Chief Hayen had a falling out, and Scharf contacted ATF claiming that Streicher's allowed a straw purchase of one of the pistols.  In February 2022, ATF performed a

---

[1]  ATF insists that Streicher's admitted that the purchase was a so-called a straw purchase. But there was no such unequivocal testimony at the revocation hearing.  Rather, one of Streicher's owners testified, "So again, presented with all the facts now, a year and half later, [the Hayen/Scharf transaction] does appear to be a straw purchase." (Tr. (Docket No. 20-2) at 292.)  This is not an admission that Streicher's realized at the time of the transaction that it was a straw purchase.

compliance inspection/review of Streicher's type 01 license, and ultimately determined that Streicher's had violated its license. ATF issued a notice to revoke the license in August 2022.

Streicher's requested a hearing, and Respondent Hans Hummel, director of the ATF's St. Paul field office, served as the hearing officer. At the hearing, ATF was represented by Theresa Hummel, who is Hans Hummel's wife. Streicher's asserts that neither Mr. nor Mrs. Hummel disclosed their relationship to Streicher's during the hearing. Streicher's contends that there were various irregularities in the presentation of testimony at this hearing that reflect the bias Mr. Hummel had in favor of his wife, but points to no specifics in this regard.

On February 21, 2023, ATF issued a final notice of revocation for both of Streicher's firearms licenses. All three of the grounds for revocation arose out of the transfer of the pistols to Chief Hayen: ATF claimed that the transfer violated the Gun Control Act because Streicher's willfully made false statements regarding the transfer, willfully sold a firearm by a person not licensed by the GCA, and willfully transferred a firearm to an unlicensed person without contacting the NICS background-check system. This final violation in the notice also faulted Streicher's for willfully failing to contact the NICS with regard to the transfer of a shotgun to a St. Paul police officer in August 2021, and the transfer of three pistols to a former Chief of the Golden Valley Police Department in September 2021.[2]

---

[2]  The original violation notice contained more alleged violations than those on which the final revocation rested. For example, the original violation noted that Streicher's failed to contact the NICS on 26 occasions, whereas the final revocation report found a violation with regard to three occasions. Only the violations in the final revocation are relevant,

The final revocation takes effect on April 25, 2023.  ATF refused to stay the revocation until after completion of Streicher's petition for judicial review, and Streicher's brought this request for temporary injunctive relief in conjunction with its Petition.

**DISCUSSION**

18 U.S.C. § 923(e) provides that the "Attorney General may, after notice and opportunity for hearing, revoke any license issued under this section if the holder of such license has willfully violated" the licensing statute's terms.  The Court reviews the revocation decision de novo and is not limited to considering only the administrative record in its review.  Id. § 923(f)(3).

Streicher's advances two main arguments in its attack on the revocation:  first, it did not willfully violate the Gun Control Act with respect to any of the transfers at issue, and second, it is entitled to a new revocation hearing before an independent hearing officer because of the conflict of interest created by the hearing officer's relationship with the ATF attorney handling the revocation.

**A.      Conflict of Interest**

Although not dispositive on the issue of the propriety of the license revocation, the evident partiality in the relationship between the hearing officer presiding over the revocation hearing and the attorney arguing the case for the ATF is as plain a violation of due process as this Court has seen.  It is well-settled that a property owner such as a firearms licensee is entitled to a hearing before such license is revoked.  See Clark v. Kan. City Mo.

---

however, because Director Hummel made no finding of willfulness as to any of the other alleged violations.  (Docket No. 20-4.)

5

Sch. Dist., 375 F.3d 698, 702 (8th Cir. 2004) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (quotation omitted).  That hearing must be before a neutral arbiter.  See Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 876 (2009) ("[A] fair trial in a fair tribunal is a basic requirement of due process.") (quotation omitted); Arnett v. Kennedy, 416 U.S. 134, 197 (1974) (White, J., concurring in part and dissenting in part) (noting that the Supreme Court has "stressed . . . that the right to an impartial decision-maker is required by due process").

ATF's response to Streicher's allegations with regard to the spousal relationship between Director Hummel and the ATF attorney wholly misses the mark.  It is irrelevant whether the hearing was formal or informal:  the purpose of the hearing was to consider evidence and determine whether to revoke Streicher's firearms licenses, and thus basic due-process protections apply.  ATF also contends that Streicher's failed to object to the relationship at the hearing itself, but the transcript does not reflect that Streicher's was informed of the relationship and waived any objection.  And ATF's insistence that it is Streicher's responsibility to show that the outcome would have been different without the apparent conflict is similarly without merit.  There is no requirement that a victim of a due-process violation in the form of a patent conflict of interest establish that the outcome of the hearing was somehow affected by the hearing officer's bias.

On this preliminary record, it appears plain that the conflict of interest in Streicher's administrative hearing violated due-process principles, rendering the outcome of the hearing void.  But because a preliminary injunction is appropriate even if the conflict of interest was not a violation of due process, the Court will reserve a specific ruling on the

6

issue pending further record development.

**B.      Injunction**

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  When deciding whether to issue a TRO or a preliminary injunction, courts consider four factors: (1) the threat of irreparable harm to the movant; (2) the balance of harm the injunction would have on the movant and the opposing party; (3) the probability that movant will succeed on the merits; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981).[3]

**1.      Likelihood of Success on the Merits**

To demonstrate a likelihood of success on the merits, Streicher's must establish that it has a "fair chance of prevailing" on its claims.  Planned Parenthood of Minn., N. Dak., S. Dak. v. Rounds, 530 F3d 724, 732 (8th Cir. 2008) (en banc).  This standard does not require "the party seeking relief [to] show 'a greater than fifty percent likelihood that [it] will prevail on the merits.'"  Id. at 731 (quoting Dataphase, 640 F.2d at 113).  And if the other three factors "strongly favor[] the moving party," then "a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation."  Dataphase, 640 F.2d at 113.

---

[3]  ATF asserts that Streicher's is inappropriately "seeking affirmative relief" because not only does Streicher's ask that the revocation be stayed, but also asks that ATF permit Streicher's to continue normal business operations.  (Docket No. 19 at 4 n.2.)  The relief Streicher's requests is to continue the status quo, which means that Streicher's can continue operating with its firearms licenses pending a determination on the merits of its Petition. This is not inappropriate "affirmative relief."

A federal firearms license may be revoked only if the licensee "willfully violated" the Gun Control Act's requirements.  "For the government to prove a willful violation of the federal firearms statutes, it need only establish that a licensee knew of its legal obligation and 'purposefully disregarded or was plainly indifferent to the record-keeping requirements.'"  On Target Sporting Goods, Inc. v. Att'y Gen. of U.S., 472 F.3d 572, 575 (8th Cir. 2007) (quoting Lewin v. Blumenthal, 590 F.2d 268, 269 (8th Cir. 1979)).

After the hearing, Director Hummel determined that Streicher's had willfully violated the Gun Control Act in three ways:  First, by indicating on required forms that Chief Hayen was the transferee of both pistols despite knowing that one pistol was intended for former Chief Scharf, Streicher's willfully made false statements with respect to information the Gun Control Act requires, in violation of 18 U.S.C. § 924(a)(1)(A) and 27 C.F.R. §§ 478.128(c), 478.124(a), and 478.125(e).  Second, by allowing former Chief Scharf to purchase the pistol, Streicher's willfully sold a firearm to a person who Streicher's knew or had reasonable cause to believe does not reside in the state in which Streicher's does business, in violation of 18 U.S.C. § 922(b)(3) and 27 C.F.R. § 478.99(a). Third, by not contacting NICS with regard to the transfers to Chief Hayen, former Chief Scharf, a St. Paul police officer, and former Chief of the Golden Valley Police Department, Streicher's willfully transferred a firearm to an unlicensed individual without first contacting the NICS, in violation of 18 U.S.C. § 922(t) and 27 C.F.R. § 478.102(a).

The Gun Control Act's regulations allow the transfer of firearms to law-enforcement officers "for official use" if the officer "provide(s) the licensee with a certification on agency letterhead, signed by a person in authority within the agency (other than the officer

purchasing the firearm), stating that the officer will use the firearm in official duties and that a records check reveals that the purchasing officer has no convictions for misdemeanor crimes of domestic violence . . . ."  27 C.F.R. § 478.134(a).  The regulation requires licensees to retain the certification letter in their files.  Id. § 478.134(c).  No NICS background check is required for transfers made pursuant to a law-enforcement certification letter.

Streicher's concedes that it did not retain the certification letters authorizing the purchases by the St. Paul and Golden Valley officers, but the record also reflects that the St. Paul Police Department and Golden Valley Police Department were issued credits for the transfers, indicating that Streicher's contention that the transfers were appropriately processed as pursuant to a certification letter is plausible.  Whether the letter authorizing Chief Hayen to receive the pistols complied with the regulation is the subject of much dispute, given that Hayen altered the letter in the presence of a Streicher's employee to provide for the transfer of two guns to him rather than one.

Streicher's argues these are the first violations of these particular types that Streicher's has ever been cited for—over nearly 30 years as a federal firearms licensee— and willfulness cannot be inferred from these few isolated violations.  It contends that other licensees have been repeat offenders in not retaining certification letters but have merely been "counseled" regarding the failure and have not had their licenses revoked.  See Jim's Pawn Shop, Inc. v. Bowers, No. 5:05-CV-525, 2008 WL 11380078, at *7-8 (E.D.N.C. Sept. 16, 2008) (noting that a court can "infer willfulness at the point repeated violations become sufficient to conclude the licensee does not care to meet its requirements, thereby

establishing plain indifference, or willfulness," but that the 28 violations at issue were not sufficient to do so); compare RSM, Inc. v. Herbert, 466 F.3d 316, 322-23 (4th Cir. 2006) (licensee's "long history of repeated failures, warnings, and explanations of the significance of the failures," involving more than 900 violations of the Gun Control Act, were sufficient to establish licensee's willfulness).

As ATF contends, only one willful violation is necessary for a license revocation—the statute does not require that violations be repeated to be actionable. However, repeated violations are often a useful evidentiary shorthand for willfulness. And ATF has cited no court decisions in which a federal firearms license has been revoked for conduct akin to that at issue here: a small number of violations and the licensee's first violations of the particular type. Indeed, as Streicher's argues, most revocations are premised on numerous and repeated violations: On Target Sporting Goods, 472 F.3d at 575 (involving a licensee's "repeated failure" to follow record-keeping requirements a selling a firearm to an individual who admitted to having been convicted of a felony); Lewin, 590 F.2d 268, 169 (8th Cir. 1979) (involving "large number of violations" including failure to keep sales records and the sale of weapons to at least three felons); Thurmond v. U.S. Dep't of Justice, No. 4:13cv2290, 2014 WL 5320487, *1 (E.D. Mo. 2014) (upholding revocation for licensee who failed to log receipt of 73 firearms, failed to obtain or record identification information for 145 firearms sales, and failed to conduct NICS check on 29 occasions); Gun Shop LLC v. U.S. Dep't of Justice, No. 4:10cv1459, 2011 WL 2214671, at *4, 7 (E.D. Mo. June 3, 2011) (upholding denial of license renewal application for licensee with 11 violations of the regulations, each involving multiple instances of those violations,

10

including 32 instances of failure to conduct NICS background checks, after ATF had three warning conferences with licensee but violations continued).

Although only one violation of the statute is required for revocation, ATF has pointed to no other case revoking a federal firearms license for one violation. As ATF argued at the hearing on this Motion, the public interest requires the uniform application of the federal firearms laws. The revocation here is contrary to that principle, given that there is no argument that any other federal firearms license has been revoked for what is in essence a single transaction with multiple potential violations arising out of that transaction. When viewed in the context of the evident partiality of the hearing officer and the underlying facts of the transaction at issue, and on this preliminary record, Streicher's has shown a fair probability that it will succeed on the merits of its challenge to the license revocation.

## 2.   Irreparable Harm

But "even when a plaintiff has a strong claim on the merits, preliminary injunctive relief is improper absent a showing of a threat of irreparable harm." Roudachevski v. All-Am. Care Centers, Inc., 648 F.3d 701, 706 (8th Cir. 2011). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). Irreparable harm is harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." Iowa Utils. Bd. v. Fed. Commc'ns Comm'n, 109 F.3d 418, 425 (8th Cir. 2006). "Failure to show

irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

Streicher's contends that the revocation of its federal firearms licenses will put it out of business and will cause its 40 employees to lose their jobs. Streicher's also contends that law-enforcement agencies will be left without access to firearms and destructive devices, but Streicher's does not have standing to claim this as irreparable harm. Possible harm to law-enforcement agencies is more appropriately weighed in conjunction with the public-interest factor.

Harm to a company's good will, or the loss of customers and business, may, if corroborated, constitute irreparable harm sufficient to support the "extraordinary remedy" of injunctive relief. See MPAY Inc. v. Erie Custom Comput. Applications, Inc., 970 F.3d 1010, 1020 (8th Cir. 2020); see also Finer Foods, Inc. v. U.S. Dep't of Agric., 274 F.3d 1137, 1140 (7th Cir. 2001) (finding irreparable harm in license revocation challenge because "allowing the suspension to continue may kill [the licensee's business]—and the United States does not afford a damages remedy to firms put out of business by administrative high–handedness"). The party seeking the injunction must show that the harm alleged is more than speculative. See S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 779 (8th Cir. 2012).

Streicher's asserts that the harm it will suffer if the injunction does not issue is more than monetary: if it loses the firearms license, it loses 90% of its firearms business. Such harm is not speculative; it is virtually certain to occur, because law-enforcement agencies and officers cannot buy firearms from an unlicensed dealer and ATF does not dispute

Streicher's assertion that 90% of its firearms business comes from law enforcement. "[T]he right to continue a business in which [the movant] had engaged for twenty years . . . is not measurable entirely in monetary terms." Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970).

Even if the revocation is ultimately overturned, Streicher's has asserted that its customers are likely to take their business elsewhere and are unlikely to return. ATF contends that this is speculative but offers no advice as to how Streicher's would prove such a hypothetical. It is reasonable to believe that if police officers cannot purchase their duty weapons at Streicher's, they will go elsewhere for not only those weapons but also other supplies necessary for their jobs, and that they may not return even if Streicher's eventually secures new firearms licenses. Streicher's has established that it will suffer irreparable harm without the requested injunctive relief.

3.    **Balance of Harms**

The balance of harms clearly favors Streicher's, as there is no harm to ATF in maintaining the status quo. There is no argument, for example, that Streicher's has sold firearms to dangerous individuals and must be prohibited from doing so to protect the public. And any potential harm is mitigated by the Court's intention to expeditiously consider and rule on the merits of the Petition.

4.    **Public Interest**

As noted above, Streicher's asserts that, if its federal firearms licenses are revoked, law enforcement agencies throughout the state will be unable to procure destructive devices and will have to seek alternative sources for firearms. ATF argues that law enforcement is

not prohibited from purchasing destructive devices from out-of-state dealers and so the public interest does not favor staying the license revocation. This argument is without merit. Even if Minnesota law-enforcement agencies are allowed to purchase their equipment outside the state, the public interest lies in keeping that business in the state and not forcing agencies to travel long distances to procure necessary equipment.

Maintaining the status quo serves the public interest, allowing law-enforcement agencies to continue to purchase and transfer firearms and destructive devices in Minnesota pending a full determination of the merits of Streicher's challenge to the revocation.

**5.    Bond**

Rule 65 requires that the movant post a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Streicher's asks that the Court waive the bond requirement; ATF "defers to the Court's discretion on the question." (Docket No. 19 at 17.)

The Eighth Circuit Court of Appeals has not joined many of its sister Circuits in determining that Rule 65's bond requirement may be waived in certain circumstances. See Rathmann Grp. v. Tanenbaum, 889 F.2d 787, 789 (8th Cir. 1989) (noting that district court must consider whether to impose a bond but not holding that bond may be waived); see also Habitat Educ. Ctr. v. U.S. Forest Serv., 607 F.3d 453, 458 (7th Cir. 2010) (noting that "a number of cases allow a district court to waive the requirement of an injunction bond"). Given the Rule's proscription, the Court will require a bond to secure the preliminary injunction. But because there is little likelihood that ATF will suffer any compensable loss

from the injunction Streicher's requests, the Court will require Streicher's to post a nominal bond of $100.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that**:

1.  Petitioner Streicher's, Inc.'s Motion for Preliminary Injunction (Docket No. 6) is **GRANTED**;

2.  Respondent Hans C. Hummel is **ENJOINED** from enforcing the revocation of Petitioner's Federal Firearms Licenses until 60 days after proceedings on the merits of this matter are concluded;

3.  Petitioner shall post a bond in the amount of $100.00 to secure the preliminary injunction;

4.  This injunction shall expire 60 days after entry of final judgment resolving Petitioner's claims on the merits, unless the Court orders otherwise; and

5.  This matter will be set for a bench trial during the Court's October 2023 trial term.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:     April 20, 2023                           s/Paul A. Magnuson
                                                    Paul A. Magnuson
                                                    United States District Court Judge